UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

REBECCA DISTEFANO,                          Case No. 12-CV-2868 (PJS/LIB)

                    Plaintiff,

v.                                                          ORDER

ESSENTIA HEALTH, f/k/a
St. Mary's/Duluth Clinic Health System,

                    Defendant.

---

Barbara Jean Felt, Clayton D. Halunen, and Shaun M. Parks, HALUNEN &
ASSOCIATES, for plaintiff.

Eric S. Johnson and Joseph J. Mihalek, FRYBERGER, BUCHANAN, SMITH &
FREDERICK, P.A., for defendant.

Plaintiff Rebecca DiStefano arrived several hours late for work on June 24, 2011.  She

had not told her employer, defendant Essentia Health ("Essentia"), that she would be arriving

late.  Essentia fired DiStefano four days later.  Essentia claims that it fired DiStefano because she

violated the company's "no show–no call" policy on June 24.  DiStefano claims that Essentia

fired her for a different, impermissible reason — either because she was disabled; or because she

engaged in activities protected under the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12101 et seq.; or because she exercised her rights under the Family and Medical Leave Act

("FMLA"), 29 U.S.C. § 2601 et seq.; or because she filed a claim for benefits under the

Minnesota Workers' Compensation Act ("WCA"), Minn. Stat. § 176.001 et seq.  Because a

reasonable jury could not find in favor of DiStefano on any of these claims, Essentia's motion for

summary judgment is granted, and DiStefano's complaint is dismissed.

## I.  FACTS

Essentia — then known as St. Mary's/Duluth Clinic Health System — hired DiStefano as a surgical nurse in 1999.  *See* DiStefano Dep. 11 [ECF No. 55].  While employed in that capacity, DiStefano incurred a series of work-related injuries.  First, in June 2002, DiStefano injured her right knee and took approximately four months of medical leave following that injury.  *See* Envall Decl. Ex. F at 1-2 [ECF No. 61-1 at 43-57].  Second, in December 2003, DiStefano injured her neck and back and took another two months of medical leave.  *Id*. at 1, 2; DiStefano Dep. 79.  Third, in July 2004, DiStefano again injured her neck and back.  *See* Envall Decl. Ex. F at 1, 2.  DiStefano took approximately two years of intermittent medical leave after that third injury.  *See* DiStefano Dep. 79-80.  Following the December 2003 and July 2004 injuries, DiStefano received worker's-compensation benefits, "including wage loss benefits, reasonable medical expenses, [and] 10% permanent partial disability . . . ."  Envall Decl. Ex. F. at 2.

The cumulative effect of these injuries left DiStefano unable to continue working as a surgical nurse.  *See* DiStefano Dep. 11.  Essentia accommodated DiStefano by giving her a position as a data analyst in June 2006.  *Id*. at 30.  Six months later, Essentia transferred DiStefano again, this time to its neurology department, where DiStefano began work as a nurse clinician.  *Id*. at 30-31; Cressman Dep. 22-23 [ECF No. 49].  She continued working in this capacity until she was fired.  *See* DiStefano Dep. 31.

In January 2011, DiStefano underwent replacement knee surgery to repair damage caused by the June 2002 workplace accident.  *See* DiStefano Dep. Ex. 14 [ECF No. 56-1 at 36-40].  She requested — and Essentia granted — medical leave for the time necessary for her to recover from

that surgery, which her doctor estimated would take six to eight weeks. *Id*. at 3. Her recovery went more slowly than anticipated, however, and DiStefano did not return to work until April 12, 2011 (approximately eleven weeks after her surgery). *See* DiStefano Dep. Ex. 17 [ECF No. 56-2 at 2]; DiStefano Dep. Ex. 18 [ECF No. 56-2 at 3]. DiStefano submitted a "request for certification of dispute" to the Minnesota Department of Labor and Industry on May 13, 2011, initiating the process for claiming worker's-compensation benefits for the "medical expenses stemming from her recent treatment, including surgery, to her right knee." Envall Decl. Ex. A at 2 [ECF No. 61-1 at 1-2]. Essentia's counsel also received a copy of this request on or about that same date. *Id*. at 1; ECF No. 59 at 19.

Shortly after her return following the knee surgery, DiStefano requested yet another period of medical leave, this time on account of neck and left arm pain. *See* DiStefano Dep. 176-77; DiStefano Dep. Exs. 19-22 [ECF No. 56-2 at 4-7]. Essentia granted this request, and DiStefano took another three weeks of medical leave beginning May 18, 2011. *See* DiStefano Dep. Ex. 22; DiStefano Dep. 181. DiStefano later filed a worker's-compensation claim petition for wages lost during this three-week absence. *See* DiStefano Dep. Ex. 34 [ECF No. 57 at 14]. Essentia received notice of this petition on June 16, 2011. *Id*.; ECF No. 59 at 20.

When DiStefano returned to work on June 7, 2011, she was told by her supervisor Gwen Cressman that she had exhausted both her paid time off and her unpaid medical leave. *See* Cressman Dep. Ex. 72 [ECF No. 49-1 at 81-87]. Cressman further explained that, should DiStefano need to take additional leave, Essentia would have to replace her. *Id*. DiStefano told Cressman that she understood that she had run out of vacation and medical-leave time. *Id*.; DiStefano Dep. 73-74.

-3-

On Thursday, June 23, 2011, Cressman asked DiStefano to come in to work the following day at either 8:00 a.m. or 8:30 a.m. to cover for other nurses who ordinarily worked during that time. *See* Cressman Dep. Ex. 74 [ECF No. 49-1 at 93]. DiStefano responded that she appreciated "the opportunity to make up some time and money" and assured Cressman that she would come in at 8:30 a.m. *Id*. But DiStefano did not make it to work by 8:30 a.m. on June 24. She had been in pain the night before and took medication to help her fall asleep. *See* DiStefano Dep. 109. She awoke at about 7:00 a.m. the morning of June 24, *id*. at 116, and "went downstairs and had some coffee," *id*. at 110 — but then, rather than get ready for work, DiStefano went back to bed. DiStefano did not call Cressman or anyone else at Essentia to let them know that she would be unable to arrive at work by 8:30 a.m.

DiStefano did not awake again until after 12:00 noon, several hours after she was supposed to start work at 8:30 a.m. *Id.* at 111-12. DiStefano called Cressman at about 12:30 p.m. to explain what had happened, *see* Cressman Dep. 170, and she arrived at work at 2:05 p.m., *see* DiStefano Dep. Ex. 28 at 1 [ECF No. 56-2 at 15-16]. DiStefano apologized to Cressman and asked whether she would be fired for the infraction. *See* DiStefano Dep. 112-13. Cressman told DiStefano that she would let the human-relations department handle the situation. *Id*. Again, this occurred on Friday, June 24.

The next work day — Monday, June 27 — DiStefano saw her doctor while awaiting a decision from Essentia about whether she would be fired. *See* DiStefano Dep. Ex 26 [ECF No. 56-2 at 13]. Her doctor declared that DiStefano was "unable to work at this time" and suggested that she be reevaluated in about three weeks. *Id*. DiStefano delivered a copy of this certification to Cressman that same day. *See* DiStefano Dep. 140. She also cleaned out her

office, because she "could read the writing on the wall" and "knew what was coming down the pike." *Id*. at 141.

The next day — Tuesday, June 28 — Cressman forwarded the certification from DiStefano's doctor to Jennie Sage, who worked in Essentia's human-resources department. *See* Cressman Dep. Ex. 79 [ECF No. 49-1 at 102-03]. Sage noted that DiStefano had only 3.11 hours of FMLA leave time remaining and that "her position is no longer protected." *Id*. at 1. DiStefano had been scheduled to work on June 28, so Essentia applied this remaining leave time to her absence that day. *Id*. Later that day, Essentia mailed DiStefano a letter informing her that it was terminating her "employment effective June 28, 2011 for failure to report or call in for work as scheduled on June 24, 2011." DiStefano Dep. Ex. 27 [ECF No. 56-2 at 17].

DiStefano applied for Social Security disability ("SSDI") benefits after her termination. *See* DiStefano Dep Ex. 39 [ECF No. 57-1 at 1-9]. In her application, DiStefano stated that both physical problems (back, neck, and leg pain) and psychological problems (anxiety, depression, and post-traumatic stress disorder) caused her to be unable to work. *Id*. at 3. The Social Security Administration ("SSA") found that she was disabled as of June 28, 2011 — the date she had been fired by Essentia — and had become entitled to SSDI benefits in December 2011. *See* DiStefano Dep Ex. 36 [ECF No. 57 at 32]. Accordingly, the SSA awarded DiStefano $18,934 in SSDI benefits for the period from December 2011 through December 2012, as well as monthly benefits of $1,480 beginning January 2013. *Id*.

Shortly before being awarded SSDI benefits, DiStefano filed this lawsuit against Essentia. In her complaint, DiStefano alleges that Essentia (1) terminated her because she was disabled; (2) terminated her in retaliation for presenting the June 27 letter from her doctor stating that she

would need additional medical leave time; (3) terminated her in retaliation for exhausting her

FMLA leave; and (4) terminated her in retaliation for filing worker's-compensation claims.  *See*

Compl. ¶¶ 46-72 [ECF No. 1].  Essentia now moves for summary judgment on each of those

claims.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome

of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Id*.  "The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in [her] favor."  *Id*. at 255.

### B.  Disability Discrimination

The parties agree that DiStefano's disability-discrimination claim should be analyzed

under the three-step framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802-04 (1973).  *See Olsen v. Capital Region Med. Ctr.*, 713 F.3d 1149, 1152 (8th Cir. 2013)

(applying *McDonnell Douglas* framework to disability-discrimination claim).  Under that

framework, a plaintiff must first establish a prima facie case of discrimination.  Specifically, a

plaintiff must show "1) an ADA-qualifying disability; 2) qualifications to perform the essential

functions of her position with or without reasonable accommodation; and 3) an adverse

employment action due to her disability."  *Id*. (quotation omitted).  Once the plaintiff establishes

a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 788 (8th Cir. 2004). If the employer meets this burden, then the burden shifts back to the plaintiff to show that the proffered reason for the adverse employment action was a pretext for discrimination. *Id.* "A plaintiff may show pretext, among other ways, by showing that an employer . . . treated similarly-situated employees in a disparate manner . . . ." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

The parties agree, for purposes of Essentia's summary-judgment motion, that DiStefano is disabled. *See* ECF No. 47 at 2 n.2. Essentia disputes, however, that DiStefano was qualified to perform the essential functions of her position with or without reasonable accommodation. At first blush, this might appear a frivolous argument. After all, DiStefano had been employed by Essentia as a nurse clinician for over four years prior to her termination, and thus she undoubtedly had the education and experience to continue performing her job. Moreover, on the Thursday before DiStefano was fired, Essentia asked DiStefano to work *additional* hours over the coming weeks, and DiStefano gladly accepted this offer. *See* Cressman Dep. Ex. 74. And, of course, DiStefano actually worked on the Friday before she was fired.

The problem for DiStefano is that she has twice asserted that as of June 28, 2011 — the day she was fired — she was *not* able to work as a nurse clinician. First, just prior to her termination, she provided Essentia with a certification from her doctor that she was unable to work until at least July 14, 2011. *See* DiStefano Dep. Ex. 26. Second, and more importantly, DiStefano later applied for SSDI benefits, and in her application she identified June 28, 2011 as the date on which her conditions "became severe enough to keep [her] from working." *See*

-7-

DiStefano Dep. Ex. 39 at 3.  The SSA agreed that DiStefano was disabled as of that date.  *See* DiStefano Dep. Ex. 36.  "[A] plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case — at least if she does not offer a sufficient explanation."  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).

One potential "sufficient explanation" is that "when the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI."  *Id.* at 803 (emphasis omitted).  Accordingly, a claimant might be qualified to perform the essential functions of her job (as long as she receives a reasonable accommodation from her employer), and yet be disabled for purposes of receiving SSDI benefits (because the SSA does not take any such reasonable accommodation into account in determining whether the claimant is disabled).

DiStefano argues just this.  She contends that she could have continued working as a nurse clinician if only she had received a reasonable accommodation from Essentia.  Therefore, DiStefano contends, the fact that she told the SSA that she was unable to work — and the fact that the SSA found that she was unable to work — do not undermine her present claim that she was able to perform the essential functions of her job.[1]

---

[1]DiStefano also claims that Essentia discriminated against her by failing to provide these accommodations.  As explained at the hearing on Essentia's summary-judgment motion, however, the accommodations sought by DiStefano have absolutely nothing to do with her termination.  In the typical failure-to-accommodate case, the plaintiff claims that she was fired for being unable to perform her job, but that she would have been able to perform her job if her employer had accommodated her.  Here, though, Essentia asserts that it fired DiStefano not for

(continued...)

DiStefano's argument is meritless, however, as the "accommodations" that DiStefano asserts Essentia should have given her are largely irrelevant to whether she could have performed the essential functions of her job on and after June 28, 2011.  For example, DiStefano argues that Essentia should have accommodated her by allowing her to show up several hours late on *June 24* without calling in to notify anyone.  But DiStefano does not explain how Essentia granting such an "accommodation" would have had any effect on her ability to perform the essential functions of her job on and after *June 28*.

Similarly, DiStefano claims that Essentia should have accommodated her by allowing her to take additional medical leave on June 28 beyond the 3.11 hours which she had remaining under the FMLA.  But this argument — that Essentia should have "accommodated" her by allowing her *not to do her job* — is an implicit admission that DiStefano was unable to perform the essential functions of her job (with or without other reasonable accommodation) on and after June 28.  *See* DiStefano Dep. Ex. 26 at 1 ("This is to certify that [DiStefano] . . . is unable to work at this time.").  Nor can DiStefano argue that Essentia's failure to provide this additional medical leave somehow caused or aggravated her disability, as the effect of her termination, like

------

[1](...continued)
being unable to do her job, but for being late without calling in to notify anyone.  No "accommodation" from Essentia would have kept DiStefano from violating this policy.  Indeed, it is clear that DiStefano was *able* to abide by the policy without any "accommodation" from Essentia.  DiStefano's partner woke her up about 90 minutes prior to her start time, and DiStefano went downstairs and had a cup of coffee before deciding to return to bed.  *See* DiStefano Dep. 110, 116.  Even assuming that DiStefano did not feel well enough to go to work, DiStefano has not suggested any reason why, while she was enjoying her morning cup of coffee, she could not have picked up the phone and called Essentia.

the effect of giving her yet more leave, was the same:  She did not work during the weeks after she was terminated.[2]

In short, DiStefano does not have a "sufficient explanation" for telling the SSA that she was unable to work beginning on June 28 and for telling this Court that she was able to perform the essential functions of her job on and after June 28.  *Cleveland*, 526 U.S. at 806.  (According to DiStefano's attorney, DiStefano has continued to receive SSDI benefits while pursuing this litigation.)  And because DiStefano cannot show that she was qualified to perform the essential functions of her job with or without accommodation, she cannot establish a prima facie case of disability discrimination.

That disposes of DiStefano's disability-discrimination claim.  The Court notes, however, that even if DiStefano could establish her prima facie case, Essentia would nevertheless be entitled to summary judgment.  Essentia has articulated a legitimate, nondiscriminatory reason for terminating DiStefano — her failure to comply with Essentia's "no show–no call" policy on June 24, 2011 — and DiStefano cannot show that Essentia's proffered reason is pretextual.

DiStefano argues that employees similarly situated to her have committed similar infractions in the past but have not been terminated by Essentia.  Therefore, says DiStefano, a

---

[2]DiStefano also suggests that her termination *caused* her not to be qualified to perform the essential functions of her job by aggravating her anxiety, depression, and other aspects of her disability.  Nothing in the record supports such a conclusion.  To the extent that DiStefano's condition worsened between when she was terminated and when she was granted SSDI benefits, it was her *physical* condition that deteriorated — both because her knee and back injuries continued worsening, and because new medication that she began taking on account of her increasing physical pain interfered with her balance and ability to retain information.  *See* DiStefano Dep. Ex. 44 at 2 [ECF No. 57-1 at 36-49].

jury could conclude that something other than her violation of the "no show–no call" policy motivated Essentia's decision to terminate her.

But DiStefano mostly compares apples with oranges.  For example, she points out that several Essentia employees have taken dozens of unscheduled paid time off ("PTO") days and absences between 2006 and 2011 without Essentia taking any adverse action against them.  *See* Felt Aff. Ex. 124 [ECF No. 60-6 at 20-22].   But DiStefano was not fired for taking an unscheduled PTO day.  (PTO includes excused absences for unplanned events such as sick days or other emergencies for which the employee nevertheless notifies Essentia.)  *See* Hosey Aff. ¶ 6 [ECF No. 66].  Nor was DiStefano fired merely for being absent.  Instead, DiStefano was fired for being several hours late *and not notifying anyone* that she would be late.  To show pretext based on disparate treatment, DiStefano must provide evidence that a similarly situated employee also violated the "no show–no call" policy but was not terminated.

DiStefano does attempt to make an apples-to-apples comparison with two individuals whom she claims have violated the "no show–no call" policy but were not terminated by Essentia:  Lisa Katzmarek and Melissa Rosin.  DiStefano's evidence is lacking, however.  With respect to Katzmarek, DiStefano's only evidence of a violation of the "no show–no call" policy is an alleged statement from Katzmarek to DiStefano on the day that DiStefano was terminated that Katzmarek had once violated the "no show–no call" policy and yet was only suspended.  *See* DiStefano Dep. 236-37.  Katzmarek denies that she ever said this to DiStefano, and she denies that she ever violated the "no show–no call" policy.  *See* Katzmarek Dep. 16 [ECF No. 52].  As a result, DiStefano's only evidence that Katzmarek violated the policy is Katzmarek's out-of-court statement, which is inadmissable hearsay when offered for its truth.  *See* Fed. R. Evid. 802.

Thus, DiStefano "cannot produce admissible evidence to support" her argument that Katzmarek is a proper comparator.  Fed. R. Civ. P. 56(c)(1)(B).

With respect to Rosin, DiStefano testified that she had witnessed Rosin come in late at least three or four times.  *See* DiStefano Dep. 237-38.  She assumes that Rosin must have violated the "no show–no call" policy because Cressman and other coworkers inquired into Rosin's whereabouts on those occasions.  *Id*.  As the non-movant, DiStefano is entitled to "all justifiable inferences . . . in [her] favor."  *Liberty Lobby*, 477 U.S. at 255.  But DiStefano's inference that Rosin violated the "no show–no call" policy is not "justifiable."  To begin, DiStefano's account is sketchy; she could not recall, even approximately, any date on which any of these putative tardy arrivals occurred, for example.  DiStefano Dep. 238.  It is difficult to determine whether Rosin is truly a comparator without knowing even the most basic information about her alleged late arrivals.  Moreover, DiStefano never asked Rosin or anyone else why Rosin had been late or whether she had received permission to be late.  *Id*.  Finally, there are myriad reasons other than a violation of the "no show–no call" policy why DiStefano's coworkers might have been unaware of Rosin's whereabouts.  Rosin testified, for instance, that on some occasions when she arrived at work late, she had tried and failed to reach a supervisor, so she "left a phone message for the supervisor as we were instructed to do."  Rosin Aff. ¶ 3 [ECF No. 68].

DiStefano's evidence as to pretext is thus made up entirely of speculation based on scant and dimly remembered facts.  By contrast, Rosin denies under oath and in no uncertain terms that she ever violated the "no show–no call" policy.  "On every occasion when I was unable to report

to work prior to my start time," attests Rosin, "I called before my start time and notified my supervisor that I would be late or absent for the day." *Id.*

The Court concludes that a reasonable jury could not find, based on the evidence in the record, that Essentia treated a similarly situated employee different from DiStefano. Because DiStefano's only argument as to pretext is that similarly situated employees were treated different, a reasonable jury could not find that Essentia's proffered reason for terminating her was pretextual.

For these reasons, Essentia is entitled to summary judgment on DiStefano's disability-discrimination claim.

## C.  Retaliation

DiStefano also claims that Essentia fired her in retaliation for her engaging in protected conduct. DiStefano is not certain *what* protected conduct, however. She offers several possibilities: First, she asserts that Essentia fired her for requesting the "accommodation" of indefinite additional medical leave on June 27, 2011, and thereby retaliated against her in violation of the ADA. Second, she asserts that Essentia fired her for exhausting her FMLA leave on June 28, 2011, and thereby retaliated against her in violation of the FMLA. Third, she asserts that Essentia fired her for seeking worker's-compensation benefits in early June 2011, and thereby retaliated against her in violation of the WCA.

As with her discrimination claim, DiStefano's retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. To establish a prima facie case of retaliation, "a plaintiff must show that (1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the adverse action

and the protected activity." *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013) (applying

*McDonnell Douglas* framework to ADA retaliation claim); *accord McBurney v. Stew Hansen's*

*Dodge City, Inc.*, 398 F.3d 998, 1002 (8th Cir. 2005) (applying *McDonnell Douglas* framework

to FMLA retaliation claim); *Kaufenberg v. Schwan's Home Serv., Inc.*, No. A08-0214, 2009

WL 234014, at *2 (Minn. Ct. App. Feb. 3, 2009) (applying *McDonnell Douglas* framework to

WCA retaliation claim).  If DiStefano establishes a prima facie case, then the burden shifts to

Essentia to proffer a non-retaliatory reason for the adverse action.  *See Muor v. U.S. Bank Nat'l*

*Ass'n*, 716 F.3d 1072, 1076 (8th Cir. 2013).  The burden then shifts back to DiStefano to produce

evidence sufficient to show that Essentia's proffered reason for the adverse action is pretext for

retaliation.  *Id.*

### 1.  ADA Retaliation

The first of DiStefano's three theories about why Essentia fired her is that Essentia

retaliated against her for requesting additional medical leave on June 27, 2011.  DiStefano's only

evidence of retaliation is the temporal proximity between her request and her termination.  She

points out that she was fired one day after presenting Cressman with the certification from her

doctor notifying Essentia that she was unable to work and thus needed additional time off.

"Generally, more than a temporal connection between the protected conduct and the

adverse employment action is required to present a genuine issue of fact on retaliation."  *Sisk v.*

*Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (quotation omitted).  "[O]nly in cases

where the [temporal] proximity is very close" may a plaintiff rest on temporal proximity alone.

*Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011).  The Eighth Circuit has

never explained exactly when temporal proximity is "very close," *id.*, but the Eighth Circuit has

said that a two-week gap between protected activity and an adverse action "is sufficient, but barely so, to establish causation," *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002).

Critically for this case, however, the Eighth Circuit has cautioned that a plaintiff's claim of retaliation, when "built on temporal proximity, is undermined where the allegedly retaliatory motive coincides temporally with the non-retaliatory motive." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1001 (8th Cir. 2011). "Moreover, evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Id*.

Both of those factors are present here. DiStefano's termination was temporally proximate not only to her request for additional medical leave, but also to her violation of the "no show–no call" policy. DiStefano requested additional leave just one work day after violating the "no show–no call" policy; indeed, she requested additional leave while she was waiting to hear if she would be fired for violating the "no show–no call" policy. *See Hill*, 737 F.3d at 1219 ("Especially where the employer's proffered reason for action is virtually contemporaneous with the protected activity, we are disinclined to declare a genuine issue of fact for trial based on temporal proximity alone."). Further, DiStefano was well aware at the time that she made her request for additional medical leave that she might be fired for violating the "no show–no call" policy. DiStefano understood that she had committed a serious offense, and she had asked Cressman on June 24 (after arriving at work several hours late) whether she would be fired for that offense. *See* DiStefano Dep. 114. DiStefano even cleaned out her office the day *before* she

was terminated because she "could read the writing on the wall."[3]  *Id.* at 141.  Given that

*DiStefano* knew *prior* to making her request for additional medical leave that she might be fired

for violating the "no show–no call" policy, a reasonable jury could not conclude that Essentia's

proffered reason for terminating DiStefano was merely pretext for retaliating against her for

requesting medical leave.

## 2.  FMLA Retaliation

The second of DiStefano's three theories about why Essentia fired her is that Essentia

retaliated against her for exhausting her FMLA leave.[4]  Again, the only evidence cited by

DiStefano in support of her claim is temporal proximity — i.e., the fact that Essentia terminated

her on the day that she exhausted her FMLA leave.  *See* Cressman Dep. Ex. 79.  This extremely

close temporal proximity between the exhaustion of her FMLA leave and her termination, says

---

[3]DiStefano's attorney casts her testimony in a different light.  She claims that DiStefano cleaned out her office because she knew that her position would not be protected while she was on medical leave and therefore that she would be moved to a different position when she returned from that leave.  *See* ECF No. 59 at 15-16.  But this badly misconstrues DiStefano's testimony. When asked why she cleaned out her office, DiStefano said nothing about anticipating being given medical leave and then a different job after returning from leave.  Instead, DiStefano answered that she cleaned out her desk because Cressman "said she was letting HR handle it" and that "we would talk about it later . . . ."  DiStefano Dep. 141.  Read in context, these statements clearly refer to her violation of the "no show–no call" policy, not to her request for medical leave.

[4]Technically, the term "retaliation" with respect to the FMLA is reserved by the Eighth Circuit for situations in which an employee suffers an adverse employment action after opposing "any practice made unlawful under the FMLA — for example, if an employee complains about an employer's refusal to comply with the statutory mandate to permit FMLA leave . . . ." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006 (8th Cir. 2012).  The claim brought by DiStefano is one of FMLA *discrimination*, not retaliation.  *See id.*  Because both parties refer to DiStefano's claim as an FMLA retaliation claim, however, the Court follows suit.  The analysis is substantially the same whether DiStefano's claim is characterized as one for retaliation or as one for discrimination.

DiStefano, shows that Essentia's proffered reason for her termination (her violation of Essentia's "no show–no call" policy) was merely pretext.

Once again, the Court finds that, because of the surrounding circumstances, a reasonable jury could not find pretext based solely on the temporal proximity between DiStefano's exhaustion of FMLA leave and her termination.  DiStefano had taken medical leave on numerous occasions — often for several months at a time — without a hint of retaliation from Essentia. *See* DiStefano Dep. 79-80 (identifying eleven leaves of absence between July 16, 2002 and June 7, 2011).  Moreover, DiStefano had essentially exhausted her medical leave by June 7, 2011, at which point she had only about three hours of medical leave remaining.  And yet, again, there was no retaliation from Essentia.[5]  *See id.*; Cressman Dep. Ex. 72.  It simply beggars belief that Essentia would permit DiStefano to take numerous medical leaves (totaling many months away from work) during her decade of employment — including two leaves of absence totaling approximately fourteen weeks between January and early June 2011, *see* DiStefano Dep. Exs. 14-22 — and then fire her for exhausting the remaining *three hours* of medical leave available to her on June 28, 2011, *see* Cressman Dep. Ex. 79.

DiStefano's FMLA retaliation claim is also undercut by the more immediate circumstances of her termination.  Again, DiStefano herself understood four days *before* she exhausted her medical leave that she might be terminated for violating Essentia's "no show–no call" policy, and she went so far as to clean out her office on the day *before* she exhausted that leave in anticipation of being terminated.

---

[5]DiStefano does not argue that Essentia retaliated against her because of any of her *prior* leaves of absence.

-17-

In short, when viewed in light of all of the evidence in the record, the fact that DiStefano was fired on the day that she exhausted her remaining three hours of FMLA leave is insufficient to permit a reasonable jury to find that Essentia's proffered reason for terminating DiStefano is pretextual.[6]  Essentia is therefore entitled to summary judgment on DiStefano's FMLA retaliation claim.

### 3.  WCA Retaliation

The third of DiStefano's three theories about why Essentia fired her is that Essentia retaliated against her for seeking worker's-compensation benefits.[7]  Minnesota law forbids employers from "discharging or threatening to discharge an employee for seeking workers'

---

[6]DiStefano also points to Sage's email to Cressman explaining that DiStefano's position would no longer be protected after DiStefano exhausted her remaining 3.11 hours of FMLA leave.  *See* Cressman Dep. Ex. 79.  But it is difficult to see how this email supports DiStefano. This email shows that Essentia correctly understood that DiStefano's position was protected while she was on FMLA leave, and that her position would no longer be protected after she exhausted her FMLA leave.  Sage's email proves merely that Essentia was being careful to *comply* with its obligations under the FMLA.

[7]DiStefano settled her 2011 worker's-compensation claims with Essentia in November 2012.  *See* Envall Decl. Ex. F.  The parties agreed that, in return for $50,000, DiStefano would "fully, finally, and completely settle . . . any and all claims . . . under the Minnesota workers' compensation statute, with the sole exception of future reasonable, necessary and causally related medical expenses relative to" her injuries suffered in June 2002, December 2003, and July 2004.  *Id.* at 8 (emphases omitted).  DiStefano, citing *Karnes v. Quality Pork Processors*, notes that the Minnesota Supreme Court has held that "[a] section 176.82 retaliatory discharge action is . . . a common law cause of action outside the purview of the Workers' Compensation Act . . . ."  532 N.W.2d 560, 563 (Minn. 1995).  Because her claim is "outside the purview" of the WCA, says DiStefano, she did not waive that claim when she agreed to settle "any and all claims" under the WCA.  Envall Decl. Ex. F. at 8.

*Karnes* is a mystifying case.  It is difficult to understand how a claim brought under a specific section of the WCA can be deemed to be a "common law" claim outside of the WCA. But because DiStefano's WCA retaliation claim fails on the merits, the Court does not reach the issue of whether she waived that claim in her settlement with Essentia.

compensation benefits . . . ."  Minn. Stat. § 176.82, subd. 1.  In arguing that she was fired for

seeking worker's-compensation benefits, DiStefano once again cites only temporal evidence —

here, the temporal proximity between the date when Essentia learned that DiStefano had filed her

final claim for worker's-compensation benefits and the date when Essentia terminated DiStefano.

*See* DiStefano Dep. 102.

The temporal evidence that DiStefano cites in support of her WCA retaliation claim is

weaker than the temporal evidence that she cites in support of her other retaliation claims.

Essentia received notice of the first of the worker's-compensation claims cited by DiStefano on

or about May 13, 2011, about six weeks prior to DiStefano's termination.  Essentia received

notice of the second of the worker's-compensation claims cited by DiStefano — which related to

lost wages for three weeks of work — on or about June 16, 2011.  *See* DiStefano Dep. Ex. 34;

ECF No. 59 at 20.  Whereas only one day passed between DiStefano's request for medical leave

and her termination, and only a few hours passed between DiStefano's exhaustion of FMLA

leave and her termination, almost two weeks passed between Essentia's receipt of notice of

DiStefano's final worker's-compensation claim and her termination.

*Smith* is instructive.  In that case, the Eighth Circuit[8] explained that, when viewed in

isolation, a two-week gap between the date an employee took leave and the date the employee

was fired was "sufficient, but barely so," to establish the employee's prima facie case of

---

[8]DiStefano's WCA retaliation claim is governed by Minnesota law, but Minnesota courts
apply the *McDonnell Douglas* framework in evaluating such claims.  *See Schmitz v. U.S. Steel
Corp.*, 831 N.W.2d 656, 664 (Minn. Ct. App. 2013).  Moreover, Minnesota courts have freely
cited federal cases in interpreting the scope of § 176.82.  *See id.* at 670; *Brenden v. Westonka
Pub. Sch., Ind. Sch. Dist. 227*, No. EM03-017571, 2005 WL 1936195, at *9 (Minn. Dist. Ct.
June 10, 2005).  DiStefano likewise cites federal case law in support of her WCA retaliation
claim.  *See* ECF No. 59 at 39.

retaliation.  *See Smith*, 302 F.3d at 833.  But the Eighth Circuit further held that when the two-week gap was viewed not in isolation but instead in conjunction with the other circumstances surrounding the termination, the two-week gap was *not* sufficient to establish pretext.  *Id*. at 834.

This case is similar.  Viewed in isolation, the two-week gap between Essentia's receipt of notice of DiStefano's final worker's-compensation claim and DiStefano's termination would be (barely) sufficient for DiStefano to establish pretext.  But that two-week gap is not sufficient to establish pretext when viewed in conjunction with the other evidence in the record.  Just as DiStefano had taken numerous lengthy medical leaves without a hint of retaliation from Essentia, so, too, had DiStefano filed several worker's-compensation claims without a hint of retaliation from Essentia.  *See* Envall Decl. Ex. F at 2 ("[T]he Employee was paid various workers' compensation benefits including wage loss benefits, reasonable medical expenses, [and] 10% permanent partial disability . . . .").  Over a period of about a decade, DiStefano was frequently gone on medical leave, and she frequently sought worker's-compensation benefits.  Again, it simply beggars belief that Essentia would pay several large worker's-compensation claims by DiStefano without a word of complaint, but then fire her because she filed a small worker's-compensation claim requesting three weeks of wages totaling approximately $3,000.  *See* Envall Decl. Ex. C. [ECF No. 61-1 at 4-13].  DiStefano's theory makes no sense, and a reasonable jury would not accept it.  Essentia's motion for summary judgment on DiStefano's WCA retaliation claim is therefore granted.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1. The motion for summary judgment of defendant Essentia Health [ECF No. 45] is

GRANTED.

2. The complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND ON THE

MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  July  8 , 2014                                s/Patrick J. Schiltz
                                                                 Patrick J. Schiltz
                                                                 United States District Judge